UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 22-cr-365 (KMM/DTS) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Damion Kent Hallmon (1), | |
| Defendant. | |

## INTRODUCTION

Defendant Damion Kent Hallmon moves to suppress evidence obtained during a traffic stop, which ultimately ended with Hallmon's arrest. He further moves to suppress un-Mirandized statements made during this stop, arguing he was effectively in custody at the time of the questioning. For the reasons explained below, the Court recommends that Hallmon's Motion to Suppress Evidence from Stop, Seizure and Search of Vehicle [Dkt. No. 24] and his Motion to Suppress Statements [Dkt. No. 25] be denied.

## FINDINGS OF FACT

On August 28, 2022 around 7:30pm, Bloomington Police Officer Kenneth LeBaron was patrolling a high-crime area of Bloomington, Minnesota. Transcript of Motion Hearing (Hrg. Tr.) at 5:10; Dkt. No. 54. While stopped at a traffic light, he saw a car with an object suspended from the car's rearview mirror. *Id.* at 5:10-6:22. The car in question was one lane over from LeBaron's squad car. *Id.* at 6:21; 18:23-25. LeBaron ran a search on the car's license plate number and learned its registered owner's driver's license was suspended. *Id.* at 6:6:6-9. Comparing the Department of Vehicle Services photo attached to the license plate search with the driver of the car, LeBaron determined the registered

owner and the driver were one and the same. *Id.* at 6:10-15. When the traffic light turned green, LeBaron changed lanes to follow the car. He engaged his emergency lights, which automatically activated his body-worn camera. *Id.* at 6:21-7:4. The car stopped after turning into the parking lot at a Home Depot. *Id.* at 6:24-7:1.

LeBaron then approached the vehicle's passenger-side door and asked the driver, Defendant Hallmon, and his passenger questions about whether Hallmon knew his license was suspended. There were two children in the backseat, as well. Gov. Ex. 1 at 19:40:40.[1] LeBaron described Hallmon as "nervous," with "standing sweat" on his neck and face. Hrg. Tr. at 8:19-21. Hallmon was speaking rapidly, *id.* at 24; Gov. Ex. 1 at 19:40:15-19:32:46, and LeBaron thought Hallmon was trying to distract him. Hrg. Tr. at 24. Hallmon acknowledged during this exchange that his license was suspended and that he had been pulled over for that offense the previous day. Gov. Ex. 1 at 19:40:34-40. LeBaron also told Hallmon he had pulled him over because of the object suspended from the car's rearview mirror. *Id.* at 19:40:51. LeBaron noticed Hallmon's eyes were dilated, bloodshot, and watery and suspected marijuana use on that basis. Hrg. Tr. at 8:25-9:2, Dkt. No. 54. LeBaron returned to his squad car where he ran a criminal history check on Hallmon, which indicated past narcotics arrests. *Id.* at 10:4-5; 9:16-17; Gov. Ex. 1 at 19:42:47-19 44:10. LeBaron, following "standard protocol," called for backup and Officer Witt arrived on the scene shortly thereafter. *Id.* at 10:7-11:1.

Based on his observations and the results of his research about Hallmon, LeBaron told Hallmon to exit the car so he could ask him questions away from the other

---

[1] All timestamps reflect the on-screen clock in the Axon Body Camera in Government's Exhibit 1.

passengers. *Id.* at 9:17-19; Gov. Ex. 1 at 19:44:20. He told Hallmon it would be "real quick" and he could leave is belongings in the car, noting that Hallmon would "be right back." Gov. Ex. 1 at 19:44:26-29. When Hallmon exited the car, a blue zip top bag marked with an image of a cannabis leaf and the words "cannabis flower" was visible next to the driver's seat on the floor. *Id.* at 19:44:40; Gov. Ex. 3. LeBaron recognized it as drug paraphernalia. Hrg. Tr. at 11:5-9. He asked Hallmon, "Is it just weed?" and smelled the inside of the bag, commenting that "it smells like weed." Gov. Ex. 1 at 19:44:45-50. Hallmon stated he had just picked up the bag from a store but acknowledged it did smell like marijuana. *Id.* LeBaron told Hallmon that he had seen these bags before and that it was not a "big deal." *Id.* at 19:44:50-54. He then walked with Hallmon over toward the squad car to "chat real quick here." *Id.* at 19:44:57.

LeBaron told Hallmon he was not a "huge ticket writer" and explained that Hallmon could be arrested for driving on a suspended license, but that LeBaron did not want to do that. *Id.* at 19:45:30-43. In light of the marijuana pouch, LeBaron asked Hallmon if there was other marijuana in the car or on his person, and whether there was anything else illegal in the car like narcotics, guns, or knives. *Id.* at 19:45:50-59. LeBaron requested to search Hallmon's person; Hallmon consented. *Id.* at 19:45:49. During the search, LeBaron asked questions best described as "small talk." *Id.* LeBaron asked to search the baseball hat Hallmon was wearing, Hallmon again consented. *Id.* at 19:47:13. Neither of these searches uncovered anything illegal.

LeBaron told Hallmon that he knew Hallmon had past narcotics arrests and asked him whether he had used recently. *Id.* at 19:47:36. Hallmon said he had smoked marijuana the day before. *Id.* at 19:47:36-38. LeBaron asked if Hallmon had been arrested

3

for crimes related to drugs other than marijuana and Hallmon confirmed he had been arrested for cocaine-related offenses. *Id.* at 19:47:40-50. LeBaron again asked whether there was drug paraphernalia in the car and Hallmon said there were probably leftover blunts in the ash tray from when he smoked the day prior. *Id.* at 19:48:03-17. LeBaron then informed Hallmon he was going to remove the kids from the car and search the car. *Id.* at 19:48:20-40.

Before searching the car, LeBaron spoke with the passenger and searched her person. He then removed the kids from the car and searched the car. *Id.* at 19:49-20:04:29. LeBaron found a P80 pistol inside the passenger's purse. *Id.* 19:52:06; Hrg. Tr. at 14:5-7. He also found drug paraphernalia, including marijuana trays, a scale, and containers, Gov. Ex. 1. at 19:54:29; Hrg. Tr. at 14:2-4, as well as blunts in the ashtray. Hrg. Tr. at 13:24-25.

After the search, LeBaron questioned the passenger who told LeBaron the gun belonged to Hallmon. Gov. Ex. 1 at 20:05:21-30. LeBaron then told Hallmon they were going to "chat" again. *Id.* at 20:06:35. He explained to Hallmon that he did not want to arrest anyone and asked who the gun belonged to. *Id.* at 20:06:49. Hallmon said it belonged to him. *Id.* at 20:07:07. He admitted that he had handed the gun to his passenger to put in her purse and before that the gun was under the seat. *Id.* at 20:07:20-26. At that point, LeBaron moved Hallmon out of sight of his children and placed him under arrest. *Id.* at 20:07:30-50. LeBaron searched Hallmon incident to arrest and placed him in the back of the squad car. *Id.* at 20:08:30-20:10:45. Hallmon was never notified of his rights under *Miranda v. Arizona*.

Hallmon has moved to suppress evidence borne of the stop, search, and seizure of his car (Dkt. No. 24) arguing LeBaron lacked probable cause to stop the car, the stop was unlawfully prolonged, and there was no legal justification to search the car. Defendant's Post-Hearing Memorandum in Support of Motions to Suppress (Def. Mem.) at 10-16, Dkt. No. 68. He also contends justifications for the stop and its expansion were merely pretext and that LeBaron was motivated to stop Hallmon because he is Black. *Id.* at 16-17. Hallmon also argues his Fifth Amendment[2] right against self-incrimination was violated (Dkt. No. 25) because he was effectively in custody when LeBaron questioned him. Def. Mem. at 18-21, Dkt. No. 68. For the reasons explained below, the Court recommends Hallmon's motions be denied.

## ANALYSIS

**I.   The Stop and Search**

**A.   Stop**

The Fourth Amendment prohibits "unreasonable searches and seizures," and provides that law enforcement may only obtain a warrant "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. A traffic stop is a seizure under the Fourth Amendment, therefore probable cause of a traffic violation is required

---

[2] Hallmon makes a passing reference to violation of his Sixth Amendment right to assistance of counsel but did not brief that issue at all. The Court thus declines to engage in in-depth analysis of that claim, other than noting that the right to counsel under the Sixth Amendment only attaches to charged offenses, a circumstance not at issue here. *Texas v. Cobb*, 532 U.S. 162, 167-68 (2001) ("The Sixth Amendment right to counsel is offense specific. It cannot be invoked. . . until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings." (quoting *McNeil v. Wisc.*, 501 U.S. 171, 175 (1991) (cleaned up)).

to justify such a stop. *United States v. Callison*, 2 F.4th 1128, 1131 (8th Cir. 2021) (citing *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006)). A traffic violation, regardless of the severity of the violation, creates probable cause to stop a vehicle. *Id.* (citing *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001). A traffic stop supported by probable cause may nonetheless become unlawful if it is unreasonably extended. *Id.* (citing *Rodriguez v. United States*, 575 U.S. 348, 350-51 (2015)).

Hallmon first argues the stop itself was not supported by probable cause and was therefore unlawful. Def. Mem. at 9. While LeBaron told Hallmon during the stop that he had pulled him over because of the object hanging from his rearview mirror, Gov. Ex. 1 at 19:40:51, Hallmon alleges the Government has not presented sufficient evidence that LeBaron really saw the object hanging in Hallmon's car. Def. Mem. at 10, Dkt. No. 68. Hallmon urges the Court to reject LeBaron's testimony because, he contends, it is inconsistent with LeBaron's bodycam footage. *Id.* at 10-11. He also argues that LeBaron intentionally left his bodycam off to hide the fact that he could never see inside Hallmon's car or the suspended object. *Id.* at 11.

This argument fails. "[A]*ny* traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the drive." *Jones*, 275 F.3d 673, 680 (8th Cir. 2001) (emphasis in original). Hallmon does not argue having an object suspended from the rearview mirror is lawful in Minnesota, instead impliedly conceding the violation. Further, Hallmon's argument that LeBaron was never in a position to see inside his car is speculation. LeBaron consistently testified that when he initially saw Hallmon's car, his squad car was in a different lane of traffic than Hallmon. He explained that they were stopped at a red light and that he changed lanes to get behind Hallmon when the light

6

turned green. He also plainly explained that his bodycam automatically engages when he turns on his emergency lights, which easily explains why there is no bodycam footage from when he was stopped at the red light. Importantly in assessing LeBaron's credibility, his testimony at the evidentiary hearing on this matter closely matched the footage from his bodycam taken during the latter part of the stop.

Moreover, even if LeBaron had turned on his bodycam earlier, the footage would likely have been useless on this question because he was in a seated position while driving his squad car. The bodycam footage thus would have merely shown his steering wheel, as seen in the beginning of Government's Exhibit 1, or perhaps other parts of the inside of the squad car, like the inside of the door, the center console, or LeBaron's computer. Moreover, Officer LeBaron testified that before the stop he had probable cause to believe Hallmon was driving without a valid license, an offense which Hallmon admitted. Hallmon's arguments as to the legality of the stop itself therefore fail.

As already noted, even a traffic stop supported by probable cause may be unlawful if it lasts longer than required to address the violation supporting the stop. *Rodriguez*, 575 U.S. at 354. The stop's "mission" ordinarily includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (citing *Delaware v. Prouse*, 440 U.S. 648, 658-60 (1979)). Police must "diligently pursue[]" the stop's investigation and authority to seize ceases "when the tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (citing *Sharpe*, 470 U.S. 675, 686 (1985). That said, certain inquiries, though unrelated to the underlying traffic violation, are acceptable. *Id.* at 355. Even those checks must be carried out expeditiously and may not

7

"prolong[] the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.*

Hallmon contends the stop was unlawful for being unreasonably elongated. Def. Mem. at 13-16, Dkt. No. 68. According to Hallmon, the stop exceeded the time necessary to address the traffic infraction—the suspended object on Hallmon's rearview mirror and his driver's license status. Pl. Mem. at 14. He contends LeBaron's claims that Hallmon showed signs of drug use were specious, that the bodycam footage does not corroborate any of them and that LeBaron's actions in purportedly investigating drug use unlawfully prolonged the stop. *Id.* Again, Hallmon urges the Court to consider as "bogus" LeBaron's testimony about his suspicion of drug use. *Id.* at 15.

Hallmon's argument again fails. First, LeBaron's questions to Hallmon upon pulling him over were related to the suspected traffic violation and were exactly the type of questions that are commonplace during a traffic stop. Inquiries about the driver's destination and purpose of his trip, plus additional questioning based on the answers to those initial inquiries are considered routine and do not unreasonably prolong a stop. *United States v. Olivera-Mendez*, 484 F.3d 505, 509 (8th Cir. 2007). Early on in the encounter, LeBaron asked Hallmon where he was going and asked whether he knew his license was suspended. Hallmon confirmed he knew about the suspended license, then volunteered that he had been cited for that violation just the day before. Moreover, during this conversation, Hallmon and his passenger were talking quickly and seemed nervous. Gov. Ex. 1 at 19:40-41. LeBaron also noted physical signs of drug use, which were not visible on the bodycam footage. Hrg. Tr. at 8:25-9:2, Dkt. No. 54. LeBaron then ran a criminal history check on Hallmon, another action considered germane to a traffic stop,

8

regardless of the traffic infraction at issue. *Rodriguez*, 575 U.S. at 355. Though LeBaron expanded the stop beyond the scope of the dangling air-freshener, he did so in light of new information learned through lawful routine questioning.

Hallmon also argues LeBaron's removing Hallmon from the vehicle unlawfully elongated and expanded the stop. But an officer may order a driver (or passenger) from a car during a traffic stop so long as doing so is reasonable under the circumstances. *Penn. v. Mimms*, 434 U.S. 106, 108-9 (1977) (citing *Terry*, 392 U.S. at 19). Reasonableness depends upon "a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Id.* at 109 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *see also Maryland v. Wilson*, 519 U.S. 408, 410 (1997). In this instance, it was reasonable for LeBaron to remove Hallmon from the car to ask him questions about his suspended driver's license and suspected drug use, in part because Hallmon's kids were in the back seat. Indeed, LeBaron consistently considered the effect of his actions on Hallmon's kids by questioning their parents outside of earshot and moving Hallmon from view when he was ultimately arrested.

### B. The Vehicle Search

Hallmon's argument that the stop was unlawfully prolonged extends to his contention that the search of his vehicle was unlawful. Warrantless searches are per se unreasonable unless an established exception to the warrant requirement applies. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). Among those exceptions is the automobile exception which provides that police may search a vehicle so long as they have probable cause to believe the vehicle contains evidence of a crime or contraband.

9

*Id.; United States v. Farrington*, 42 F.4th 895, 898-99 (8th Cir. 2022). Where "there is a fair probability" that contraband will be found in a place, there is probable cause to search. *Id.* (citing *Illinois v. Gates*, 462 U.S. 213 (1983)). The search may include any containers inside the vehicle where there is probable cause to believe contraband may be found. *Farrington*, 42 F.4th at 899. In other words, "the scope of a warrantless search of an automobile is thus not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the *object of the search* and the places in which there is probable cause to believe that it may be found." *United States v. Ross*, 456 U.S. 798, 824 (1982) (emphasis added).

As already explained, LeBaron was justified in removing Hallmon from his vehicle during the stop, and that conduct did not unlawfully prolong the encounter. Importantly for the legality of the search, when Hallmon opened the driver's side door LeBaron saw what he recognized from his experience to be a bag containing marijuana. This bag was plainly visible on LeBaron's bodycam. Gov. Ex. 1 at 19:44:39. That alone provided LeBaron with probable cause to suspect there may be additional contraband in the vehicle. *Kennedy*, 427 F.3d at 1140. LeBaron also went further by opening the bag to look at and smell its contents to confirm his belief that the bag contained marijuana. Both he and Hallmon agreed the bag smelled like marijuana, though it was almost entirely empty. *Id.* at 19:44:50. Furthermore, LeBaron spoke with Hallmon before deciding to search the vehicle, asking him whether there was other contraband in the car. Hallmon acknowledged there were likely small marijuana blunts leftover from his smoking in the car a day earlier. *Id.* at 19:48:03-17. This again provided LeBaron probable cause to search the car.

### C. Pretext

Hallmon's last argument as to the lawfulness of the stop and resulting search suggests LeBaron in fact stopped Hallmon not because of a traffic violation but because Hallmon is Black. In support of this argument, Hallmon cites investigations into Minneapolis Police Department (MPD) conduct, including those undertaken by the Minnesota Department of Human Rights in the wake of George Floyd's murder. Def. Mem. at 16-17. In particular, Hallmon points out that the MDHR's investigation found that MPD officers often stopped Black drivers then purported to smell marijuana as a pretext to search the car. He contends LeBaron did the same thing here. *Id.* at 17.

This argument belies the record, which indicates that LeBaron stopped Hallmon initially because of the air freshener hanging from his rearview mirror and because Hallmon's license was suspended. LeBaron never claimed to smell marijuana, absent deliberately smelling the inside of a bag marked with a cannabis leaf, a markedly different circumstance from a police officer noticing the smell of marijuana emanating from a vehicle. LeBaron's subsequent conduct was lawful, as described above. While Hallmon may be correct that the same issues plaguing the MPD also plague nearby police departments, the assertion that race motivated this stop is not supported by this record.

## II. Un-Mirandized Statements

Hallmon contends he was effectively in custody throughout the encounter and that because he was neither read his *Miranda* rights nor validly waived those rights, his statements made about drug use and ownership of the gun should be suppressed. Because Hallmon was not in custody under *Miranda*, the Court recommends his motion be denied.

Police must notify a defendant of their procedural rights whenever subjecting them to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436 (1966). Whether a defendant is in custody depends on the circumstances surrounding the questioning, the critical inquiry being whether "a reasonable person would have felt free to terminate the questioning and leave." *United States v. Simpson*, 44 F.4th 1093, 1096 (8th Cir. 2022) (quoting *United States v. Ferguson*, 970 F.3d 895, 901 (8th Cir. 2020). The Eighth Circuit has enumerated several factors used in assessing custody, including purpose, place, and length of the interrogation. *United States v. Griffin*, 922 F.2d 1343, 1348 (8th Cir. 1990). Interrogation under *Miranda* includes "express questioning" as well as "words or conduct that officers should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Jones*, 842 F.3d 1077, 1082 (8th Cir. 2016) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

Though a traffic stop unquestionably inhibits "freedom of action," traffic stops are generally not considered "custody" for purposes of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 436 (1984). Courts point to several indicia belying custody, which hew closely to the *Griffin* factors mentioned above. Those indicia include that traffic stops are presumptively short, happen in public places, and involve less police dominance than interrogation at a police station. *Id.* at 438-39. More specifically, courts consider the length of the questioning, the general tenor of the questioning—that is, whether the questioning was hostile or coercive—and whether there was a show of force, either through the presence of multiple police officers or brandishing of weapons. *E.g.*, *United States v. Johnson*, 954 F.3d 1106 (8th Cir. 2020); *United States v. Thompson*, 976 F.3d 815 (8th Cir. 2020); *United States v. Cruz-Rivera*, 14 F.4th 32 (1st Cir. 2021); *United States v.*

12

*Coulter*, 41 F.4th 451 (5th Cir. 2022). Just as *Terry*[3] stops are typically nonthreatening, noncoercive, temporary, and brief, so too are traffic stops and neither *Terry* stops nor traffic stops are presumptively custodial, requiring *Miranda* warnings. *Berkemer*, 468 U.S. at 439-40 (1984).

Hallmon contends that the *Griffin* indicia of custody support finding that he was in custody and that his un-Mirandized statements should therefore be suppressed. Def. Mem. at 18. Those indicia of custody are (1) whether police informed the defendant he was in custody; (2) whether the defendant possessed unrestrained freedom of movement; (3) whether the police instigated questioning or the defendant did so; (4) whether police used strongarm tactics or deceptive stratagems during interrogation; (5) whether the interrogation was dominated by police; and (6) whether the defendant was placed under arrest at the end of questioning. Hallmon contends each of these six factors militates in favor of finding he was in custody during the encounter. Def. Mem. at 18-20. The Government takes a different view. The Court assesses each factor in turn.

(1)     LeBaron never told Hallmon explicitly that he was in custody, nor did he inform him that he was *not* in custody. If applying this factor strictly, it favors Hallmon, because, as the *Griffin* court explained "the absence of police advisement that the suspect is not under formal arrest, or that the suspect is at liberty to decline to answer questions, has been identified as an important indicium of the existence of a custodial setting." *Griffin*, 922 F.2d at 1350. But looking to the totality of the circumstances during the stop, LeBaron repeatedly mentioned that the questioning or "chats" would be brief, that

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

13

Hallmon would return to the other passengers shortly, etc. While these statements did not explicitly advise Hallmon of lack of custody, they do *suggest* he was not in custody.

(2) Hallmon contends that his freedom of movement was constrained during his encounter with LeBaron, because LeBaron was directing Hallmon where to go, stand, and remain during the questioning and the vehicle search. Because he was "under the authority and supervision" of police throughout and "under their watch at all times," this factor militates toward custody, Hallmon argues. Def. Mem. at 19-20; Dkt. No. 68. The Government counters that while Hallmon was not free to move about as he liked during the encounter, the restraint was not tantamount to arrest and instead was typical of level of restraint stopped drivers face. Gov. Mem. at 14.

The Court agrees with the Government that the level of restraint Hallmon experienced was not out of the ordinary for a traffic stop. Even where a defendant answers questions while in the back of a police patrol car, a much more restrained position, the Eighth Circuit has found he is not in custody. *United States v. Johnson*, 954 F.3d 1106, 1111 (8th Cir. 2020). This factor favors the Government's position.

(3) Hallmon argues, and the Government impliedly agrees, that the Government initiated questioning during the encounter. Def. Mem. at 20, Dkt. No. 68; Gov. Mem. at 15, Dkt. No. 74 ("Mr. Hallmon did voluntarily acquiesce to official requests to respond to questions."). While custody is more likely to exist where the confrontation was instigated at the direction of law enforcement, *Griffin*, 922 F2d at 1351, the presumption against custody during a traffic stop—necessarily instigated by police— belies a finding of custody here. *See Berkemer*, 468 U.S. at 436.

(4)     Hallmon next contends that LeBaron admitted at the evidentiary hearing on this matter that he used deceptive strategies when questioning Hallmon, including lying about writing tickets and his intent to arrest him. Def. Mem. at 20-21; Dkt. No. 68. The Government argues LeBaron's conduct, even his "white lies," do not amount to deceptive or strongarm tactics. The inquiry boils down to whether the alleged deceit would have "prevent[ed] a reasonable person from terminating the interview." *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006).

LeBaron's statements that he did not write a lot of tickets and that he did not want to arrest anyone, though possibly deceptive, are also easily read as de-escalation tactics. Furthermore, Courts have found even more obvious trickery or intimidation does not change the analysis. For example, an officer's false implication that the defendant's fingerprints were at the crime scene was not deceptive in a manner that would have made the defendant feel he was in custody. *United States v. Sheikh*, 367 F.3d 756, 760 (8th Cir. 2004). Here, though LeBaron admittedly lied about some of his intentions, those lies were not so deceptive as to make a reasonable person feel they were not free to leave.

(5)     As to the fifth *Griffin* factor, Hallmon contends the atmosphere of the questioning was dominated by police. He notes that there were two officers, both in uniform with badges and firearms. Def. Mem. at 21; Dkt. No. 68. The Government counters that the presence of only two officers does not create a custodial atmosphere. Gov. Mem. at 16; Dkt. No. 74. The presence of police on its own is not "domineering" in the way the *Griffin* court described in explicating this factor. *Griffin*, 922 F.2d at 1352; *see also United States v. Axsom*, 289 F. 3d 496 (8th Cir. 2002) ("While nine persons participated in the execution of the search warrant, only two agents conducted the

15

interview.") The encounter here was not so police-dominated that a reasonable person would feel they were in custody. Hallmon was only questioned by one officer at a time (only LeBaron). While a person may feel restrained if surrounded by police, that was not the case here. *Griffin* warns that "[a] frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements." 992 F.2d at 1352. This "diminishes the public character" of the questioning and establishes "dominion over" the defendant. *Id.* Here, Hallmon was removed from the presence of his family—the passenger and his children. But that removal did not change the overall public character of the encounter. The stop occurred in a high traffic area in a busy parking lot. Hallmon could still see his family during the encounter and was reunited with them at points throughout. The public was also witness to the stop—anyone in the Home Depot parking lot could have observed the interaction. These circumstances are not "domineering." *See Griffin*, 922 F.2d at 1352. Moreover, these circumstances all helped protect Hallmon's right against self-incrimination, just as the Court in *Miranda* intended. 384 U.S. at 491-92 (describing Miranda's interrogation which took place in a designated interrogation room with two officers, lasting two hours during which "his right not to be compelled to incriminate himself [was not] effectively protected").

(6)    Lastly, both parties and the Court agree the sixth factor suggests Hallmon was in custody during questioning because he was placed under arrest at the conclusion of the encounter.

Weighing the factors indicates Hallmon was not in custody. Importantly, even discounting the balance of these factors, the totality of the circumstances demonstrates that Hallmon was not in custody when LeBaron questioned him. At no point was Hallmon physically restrained or surrounded. Hallmon was able to communicate with his family including supervising his kids off and on during the encounter. While the entire length of the stop lasted over 30 minutes, LeBaron questioned Hallmon for only a small fraction of that time, further belying any suggestion that Hallmon's will to avoid self-incrimination was overborne. Hallmon has not demonstrated that any of the conditions he faced during the encounter were "comparable to those associated with a formal arrest." *Berkemer*, 468 U.S. at 440. Because Hallmon was not in custody, *Miranda* warnings were not required and his statements need not be suppressed.

## RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS THAT:

1. Hallmon's Motion to Suppress Stop and Search [Dkt. No. 24] be **DENIED**.
2. Hallmon's Motion to Suppress Statements [Dkt. No. 25] be **DENIED.**

Dated: July 20, 2023         \_\_\_s/David T. Schultz\_\_\_
                             DAVID T. SCHULTZ
                             United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).