## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                                    No. 22-CR-365 (KMM/DTS)

              Plaintiff,

v.                                                                                  **ORDER**

 Damien Kent Hallmon,

              Defendant.

While on patrol in the City of Bloomington, Police Officer Kenneth LeBaron stopped a minivan driven by Damien Kent Hallmon for traffic violations. Based on his interactions with Mr. Hallmon during the stop, Officer LeBaron suspected there was contraband in the minivan, and searched it. Officer LeBaron found a firearm and several rounds of ammunition and when he asked Mr. Hallmon whose gun it was, Mr. Hallmon stated it was his. Because Mr. Hallmon had previously been convicted of a felony, Officer LeBaron arrested him. The government indicted Mr. Hallmon with being a felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8).

Mr. Hallmon filed a motion to suppress the evidence obtained from the search of the minivan, arguing that it was seized in violation of his Fourth Amendment rights. [ECF 24.] He also filed a motion to suppress statements he made to Officer LeBaron at the scene of the stop, arguing that he was interrogated in violation of his Fifth Amendment right to be free from self-incrimination. [ECF 25.] On March 16, 2023, United States Magistrate Judge David T. Schultz conducted an evidentiary hearing on

Mr. Hallmon's suppression motions. [Tr. of Mots. Hr'g ("Tr."), ECF 54.] Officer

LeBaron testified on behalf of the government, and the Court received exhibits from both

the government and the defense.[1] Following post-hearing briefing, Judge Schultz issued a

Report and Recommendation ("R&R") containing findings of fact and conclusions of law

regarding Mr. Hallmon's motions to suppress evidence and statements. [R&R, ECF 79.]

Judge Schultz recommends that both motions be denied. Mr. Hallmon filed timely

objections on August 10, 2023. [Objection ("Obj."), ECF 84.][2] For the reasons that

follow, the R&R is accepted and the motions to suppress evidence and statements are

denied.

## I.   Facts

Around 7:30 p.m. on August 28, 2022, Officer LeBaron was on patrol in an area

of Bloomington that he described as being "well known" for criminal activity. He saw a

minivan in an adjacent lane that had an object suspended from the rearview mirror, which

is a traffic violation. Officer LeBaron then ran a check of the minivan's license plate and

determined that the registered driver had a suspended driver's license. Officer LeBaron's

---

[1] Government's Exhibit 1 is a portable media copy of Officer LeBaron's body-worn
camera's footage. Government's Exhibit 2 is a portable media copy of body-worn camera
footage from assisting Officer Witt. Government's Exhibit 3 is a photograph of a small
plastic baggie that fell from Mr. Hallmon's lap when he was first asked to exit the
vehicle. Defense Exhibit 1 is a copy of a video feed from Officer LeBaron's patrol
vehicle. Defense Exhibit 2 is the physical baggie, the photograph of which was depicted
in Government's Exhibit 3.

[2] In addition, Mr. Hallmon personally submitted a letter detailing his disagreements with
the R&R and describing how hard his incarceration has been for himself and his family.
The Court considered these arguments in addition to counsel's memorandum as it
prepared this Order.

vehicle has the capability to review all information associated with a vehicle, including a Department of Vehicle Services photograph of the registered owner, and he pulled up that information. While stopped at an intersection for 30 seconds or so, Officer LeBaron was right next to the driver and got a clear look at the driver's face. He determined that the driver was the registered owner, who was therefore driving on a suspended license.

Officer LeBaron decided he was going to stop the minivan for the traffic violations. Because he was next to the vehicle at the intersection, when the light turned green he fell back so the minivan could pull ahead of him, and it turned into a Home Depot parking lot. As the vehicle pulled into the parking lot, Officer LeBaron activated his emergency lights, which then automatically turned on his body-worn camera ("bodycam").

Once the minivan was stopped, Officer LeBaron approached the passenger door and motioned for the passenger to lower the window, which she did. The bodycam recording shows that Officer LeBaron discussed the reasons he stopped the minivan with its occupants, Mr. Hallmon and his passenger, Ieisha McGrone. There were also two young children in the backseat. Officer LeBaron stated that he had pulled the minivan over because Mr. Hallmon had a suspended license. Mr. Hallmon responded that he knew his license was suspended and had received a ticket for it the previous day, at one point passing a copy of the citation to Officer LeBaron during the exchange. Mr. Hallmon also told LeBaron that his daughter had recently passed away, explained that his family was

temporarily staying in a hotel and that they had just been at the funeral home.[3] Officer LeBaron told Mr. Hallmon that he had also pulled him over for having an object (a pine-tree shaped air freshener) suspended from his rearview mirror.

During this exchange, Officer LeBaron stated that he could see standing sweat on Mr. Hallmon's face and neck and that his eyes were dilated, bloodshot, and watery, which are, in Officer LeBaron's training and experience, signs of marijuana use.[4] Officer LeBaron believed Mr. Hallmon appeared nervous. Mr. Hallmon was speaking rapidly during the exchange, which Officer LeBaron thought might have been an attempt to redirect his attention.

Officer LeBaron returned to his patrol vehicle and ran a criminal records check on Mr. Hallmon, learning that he had prior arrests for drug offenses. Around that time, an assisting officer, Officer Witt, arrived on the scene. Officer LeBaron returned to the minivan and asked Mr. Hallmon to step out of the vehicle. Officer LeBaron wanted Mr. Hallmon to step out of the vehicle because the two minor children were in the backseat, and he planned to speak with Mr. Hallmon away from them.[5]

---

[3] Mr. Hallmon shared additional details about the tragic loss of his daughter in his letter to the Court.

[4] Officer LeBaron's bodycam recording neither explicitly confirms, nor contradicts these details.

[5] On several occasions during the encounter, Officer LeBaron individually took the adults aside while either Ms. McGrone or Mr. Hallmon remained with the children so that he could speak with one of the adults away from the children.

When Mr. Hallmon opened the driver's side door and exited the vehicle, a small plastic baggie fell to the floorboard of the car between the side of the driver's seat and the opened door. Officer LeBaron had encountered this type of baggie several times before and immediately recognized the baggie as packaging for marijuana. Notably, the baggie has a picture of a marijuana leaf and said "cannabis flower" on the outside. Officer LeBaron grabbed the baggie right away, asked Mr. Hallmon if it was "just weed" and smelled it, indicating that it smelled like marijuana. Mr. Hallmon agreed.

Officer LeBaron asked Mr. Hallmon if he could pat him down and Mr. Hallmon consented. Mr. Hallmon also consented to having Officer LeBaron search inside his hat.[6] Officer LeBaron found nothing incriminating during these searches.

Officer LeBaron then told Mr. Hallmon that he knew Mr. Hallmon had prior arrests for drug offenses and asked him if he had used drugs recently. Mr. Hallmon stated that he had smoked marijuana the day before. He also admitted that he had been arrested for cocaine-related offenses in the past. Officer LeBaron asked Mr. Hallmon whether there were any other drugs or drug paraphernalia in the vehicle, and Mr. Hallmon

---

[6] Mr. Hallmon suggests that the evidence does not support a conclusion that he consented to either the search of his person or his hat. The bodycam recording shows otherwise. [Obj. at 9.] When Officer LeBaron asked if he could search Mr. Hallmon, Mr. Hallmon puts his hands up, says "yes sir," and begins to turn around. [Gov't Ex. 1 at 6:45–6:50.] LeBaron then asks Mr. Hallmon "Do you have anything in your hat man? Do you mind if I check your hat, would that be ok?" and Mr. Hallmon removes his cap from his head and hands it to LeBaron. [Gov't Ex. 1 at 8:01–8:07.] However, no evidence was seized from Mr. Hallmon during that search and its legality is not before the Court.

admitted that there were probably some leftover blunts or roaches in the ashtray. Officer LeBaron then told Mr. Hallmon he was going to search the vehicle.

Officer LeBaron asked Ms. McGrone to step out of the vehicle, briefly searched her person, and then had her get the couple's children out of the vehicle so that he could search the minivan. He found some marijuana paraphernalia and blunts in the ashtray. In Ms. McGrone's purse he found a pistol and several rounds of ammunition.

When Officer LeBaron had completed his search, he spoke to Ms. McGrone and asked her who the firearm belonged to. Ms. McGrone's demeanor visibly changed, indicating that she likely realized at this point in the encounter that someone was getting arrested. Referring to Mr. Hallmon, she said that he was all she had, and discussed her concerns about their children. However, she reluctantly admitted that the firearm belonged to him, and that he had given it to her to put in her bag.

Next, Officer LeBaron questioned Mr. Hallmon by the front of his squad car. At this point, without having advised Mr. Hallmon of his right to remain silent or to have an attorney present during questioning, LeBaron asked Mr. Hallmon whose gun was in Ms. McGrone's purse. Mr. Hallmon said "I'm taking the fall for that." [Gov't Ex. 1 at 27:43–44, 27:50–54.] Officer LeBaron asked Mr. Hallmon additional questions, noting first that the firearm was in Ms. McGrone's bag along with *her* credit cards and other items indicating the bag belonged to her, all designed to confirm whether the pistol was, in fact, Mr. Hallmon's. In response, Mr. Hallmon stated "it's mine." [Gov't Ex. 1 at 27:56–57.] He said he had found it "somewhere" and kept it, described what it looked

like, and that it had been under the seat before he gave it to Ms. McGrone to place in her purse. [Gov't Ex. 1 at 27: 58–28:18.]

Several times during the traffic stop and when Officer LeBaron was asking Mr. Hallmon questions, Officer LeBaron stated that he was "not a big ticket writer," suggested he was trying to get everyone on their way as quickly as possible, and made other statements suggesting he did not want to get anyone in trouble.

## II.     Legal Standard

A magistrate judge may conduct evidentiary hearings and submit proposed findings of fact and recommended dispositions on motions to suppress evidence. 28 U.S.C. § 636(b)(1)(B); Fed. R. Crim. P. 59(b)(1). The district court reviews de novo any portion of the R&R to which specific objections are made. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3); D. Minn. LR 72.2(b). When conducting such a review of an R&R after the magistrate judge holds an evidentiary hearing, the district court must review the evidence admitted at that hearing, including any transcript of the testimony of witnesses and any video or audio recordings. *See United States v. Azure*, 539 F.3d 904, 910–11 (8th Cir. 2008); *Jones v. Pillow*, 47 F.3d 251, 252 (8th Cir. 1995); *United States v. Benitez*, 244 F. App'x 64, 66 (8th Cir. 2007)).

## III.    Analysis

Mr. Hallmon filed objections to the R&R related to both his motion to suppress evidence and his motion to suppress statements. Generally, he asserts that the R&R "failed to meaningfully scrutinize the video evidence and adequately address the contradictions in the arresting officer's testimony, or sufficiently analyze the applicable

legal considerations." [Obj. 1.] Mr. Hallmon lodges specific objections to several of the R&R's factual determinations and legal conclusions. Based on the Court's de novo review, Mr. Hallmon's objections are overruled and the motions to suppress are denied.

### A. Initial Stop

The Fourth Amendment protects against unreasonable searches and seizures, including unreasonable traffic stops. *See United States v. Hanel*, 993 F.3d 540, 543 (8th Cir. 2021). "Under the Fourth Amendment, law enforcement officers may stop a vehicle if they have an articulable and reasonable suspicion that a traffic violation has occurred, even if the traffic violation is only minor." *United States v. Beard*, 708 F.3d 1062, 1065 (8th Cir. 2013) (quotations omitted); *see also Hanel*, 993 F.3d at 543 (concerning probable cause of a traffic violation).

Mr. Hallmon argues that evidence obtained from the search of the minivan must be suppressed because it is the fruit of an unlawful traffic stop unsupported by probable cause that any traffic violation occurred.[7] The R&R concluded otherwise. Specifically, the R&R found that Officer LeBaron (1) saw an object suspended from the minivan's rearview mirror; (2) ran a search of the license plate number and learned that its registered owner's driver's license was suspended; (3) compared the DVS photo attached to the license plate search with the driver of the car and determined that the driver was the registered owner of the vehicle; and (4) then activated his emergency lights and

---

[7] ECF 24 (lack of cause to stop the vehicle); ECF 32 at 7–8 (same); ECF 68 at 10–13 (same).

stopped the minivan. [R&R at 1–2.] Based on these findings, the R&R concluded that Officer LeBaron had probable cause to believe that he had observed a traffic violation for both the air freshener hanging from the rearview mirror and the driver's lack of a valid license. [R&R at 6–7.] In reaching that conclusion, the R&R rejected Mr. Hallmon's argument that Officer LeBaron's testimony about his observations was not credible because it was inconsistent with the video evidence. Judge Schultz also declined to infer that LeBaron had intentionally left his bodycam off at the beginning of the encounter to conceal the fact that he never saw an object suspended from the rearview mirror. [R&R at 6–7.]

Minnesota law prohibits driving with objects suspended between the driver and the windshield, with limited exceptions. Minn. Stat. § 169.71, subd. 1; *Gerding v. Comm'r of Pub. Safety*, 628 N.W.2d 197, 200 (Minn. Ct. App. 2001). Mr. Hallmon does not dispute this. [ECF 68 at 10 n.8.] Driving with a suspended license is also a traffic violation in Minnesota, Minn. Stat. § 171.24, subd. 1(1), and Mr. Hallmon does not suggest otherwise. Therefore, he does not contend that either of the justifications Officer LeBaron provided for pulling him over were not, in fact, traffic violations.

Instead, Mr. Hallmon objects to the R&R's findings that Officer LeBaron actually observed an object hanging from the rearview mirror and that he compared the DVS photo of the registered owner to the minivan's driver and concluded they were the same person prior to initiating the stop. [Obj. at 11.] Hallmon argues that LeBaron's testimony should be rejected because it is saturated with inconsistencies and contradictions. For example, Mr. Hallmon suggests that the Court should reject Officer LeBaron's testimony

9

that he observed an object hanging from the rearview mirror as uncorroborated and self-serving. He argues that the video evidence supplied by the government never actually shows the object suspended from the rearview mirror and that "LeBaron testified that he could have begun his bodycam recording at any time" but chose not to initiate it sooner. Consequently, Mr. Hallmon contends that it is most reasonable to conclude Officer LeBaron did not turn his bodycam on earlier because it would have confirmed that he was never actually alongside Mr. Hallmon's vehicle and "was not in a position to observe the air freshener until after he stopped Hallmon's vehicle." [Obj. at 12, 13.] Further, Mr. Hallmon suggests that the Court should disregard LeBaron's testimony about what he observed during the moments before the bodycam and squad videos began recording because the Bloomington Police Department's policies and procedures "fail to preserve legally significant videos." [Obj. at 15.] In this same vein, Mr. Hallmon contends there are flaws with nearly every piece of Officer LeBaron's testimony concerning the justifications for the stop, and therefore with the R&R's findings that the stop was justified.

Mr. Hallmon's arguments all converge into a challenge to Officer LeBaron's credibility. And the Court reviews credibility findings de novo. *United States v. Lothridge*, 324 F.3d 599, 600–01 (8th Cir. 2003); *Rick v. Harpstead*, __ F. Supp. 3d __, 2023 WL 4109140, at *7–11 (D. Minn. June 21, 2023) (overruling credibility objections based on review of the record). Based on a de novo review of the record, the Court concludes that Officer LeBaron testified credibly concerning the justifications for the

stop of the vehicle and that his testimony established probable cause, or at a minimum, reasonable articulable suspicion justifying the stop.[8]

The Court overrules Mr. Hallmon's credibility challenges. Not only was Officer LeBaron's testimony itself credible, but it is corroborated at critical points by the bodycam video. First, Officer LeBaron testified consistently that when he encountered Mr. Hallmon's vehicle, he was in the next lane of traffic alongside the minivan while both vehicles were stopped at a red light at an intersection. The video evidence shows that the air freshener hung far enough below the rearview mirror that it would likely have been visible to a person seated in a vehicle in an adjacent lane of traffic. He also testified consistently that he had a good view of Mr. Hallmon from where he was and was able to compare him with the DVS photo from the license plate search that he had run on the vehicle. [Tr. 24–25, 80–81, 82.] Mr. Hallmon's arguments to the contrary notwithstanding, the Court finds that Officer LeBaron's testimony regarding the justification for stopping the minivan is neither internally inconsistent, nor contradicted by other evidence.

Mr. Hallmon makes much of the fact that there is no video evidence showing the object suspended from the minivan's mirror, nor displaying Officer LeBaron's squad car alongside the minivan as he compared a DVS photo of the registered owner to the

---

[8] Mr. Hallmon suggests that "a further evidentiary hearing is necessary for the Court to accurately assess the officer's credibility." [Obj. at 28.] Having carefully reviewed all the evidence de novo, the Court disagrees. The Court finds no basis to disagree with Judge Schultz's conclusion that Officer Lebaron testified truthfully.

appearance of the minivan's driver. But the lack of video evidence does not undermine the credibility of Officer LeBaron's testimony about his observations. Officer LeBaron provided a straightforward and believable explanation for why no bodycam footage was available. The camera automatically begins recording when he activates his squad car's emergency lights and retroactively captures only an additional "30-second buffer period" from before they are engaged. [Tr. 6, 7, 31.] Officer LeBaron testified that the same is true of the squad video—it began recording when the emergency lights activated and likewise has a 30-second buffer. [Tr. 19, 25.] The evidence on this point is consistent and the explanation is perfectly sensible.

Although Mr. Hallmon is correct that Officer LeBaron can also activate his bodycam "whenever [he] would need to,"[9] that fact does not undermine his credibility. The defense points to no basis in the record to support its supposition that Officer LeBaron intentionally delayed activating his bodycam sooner to cover up a baseless traffic stop with a post-hoc justification. And the implicit suggestion that the camera should be running simply because an officer is considering a traffic stop finds no support in the facts or the law.

Mr. Hallmon also expresses his disagreement with the R&R's conclusion that any earlier footage from the bodycam taken while Officer LeBaron was in the squad car would have been of limited usefulness "because [LeBaron] was in a seated position while driving [and the video] would have merely shown his steering wheel as seen in the

---

[9] Tr. 31.

beginning of Government's Exhibit 1." [R&R at 7.] Although Mr. Hallmon calls this

aspect of the R&R speculation, it is nothing of the sort. The early portion of the bodycam

footage shows precisely the viewpoint described in the R&R. Based on the Court's de

novo review of the video evidence, whether the bodycam started recording ten seconds or

ten minutes earlier, it is very unlikely that any of that footage would have provided video

confirmation or contradiction of whether an object was suspended from the rearview

mirror.

Mr. Hallmon next argues that Officer LeBaron's testimony is not credible because

his "own bodycam video shows him looking up Hallmon's DVS information and photo

**after** the purported encounter where LeBaron claims that he was looking directly at

Hallmon." [Obj. at 14 (emphasis in original).] In the bodycam footage that recorded

inside Officer LeBaron's squad car before he activated his emergency lights, he can be

seen scrolling through records on his computer and arriving at a page that includes

Mr. Hallmon's photograph. [Gov't Ex. 1 at 0:01–0:15.] There is no dispute that the squad

car is moving at this time and Officer LeBaron was not stopped at an intersection right

next to Mr. Hallmon when he pulled up that picture of Mr. Hallmon on his computer

during this portion of his bodycam video. But Mr. Hallmon points to no evidence to

support the inference he asks the Court to draw—that because Officer LeBaron was

scrolling through records while following behind the minivan shortly before he stopped it

in the parking lot, his testimony that he pulled up the DVS photo earlier and compared it

to Mr. Hallmon's face while stopped at a red light is not believable. Again, Officer

LeBaron's testimony was consistent that he was able to view Mr. Hallmon before any

video started, he pulled up the DVS image and compared it to him, and he saw the object suspended from the rearview mirror at the same time. [*E.g.*, Tr. 19, 81–82.] The subsequent scrolling through the same records does not mean that the officer had not already done so.

Mr. Hallmon also argues that the Court should discredit Officer LeBaron's testimony because the photograph connected with the DVS license plate search that LeBaron said he reviewed did not physically resemble Mr. Hallmon's appearance on August 28, 2022. Specifically, he states that although "the DVS photo shows Mr. Hallmon to be bald and without eyeglasses, at the time of the incident Mr. Hallmon was wearing a cap and had eyeglasses and had little resemblance to the DVS photo." [Obj. at 3.] Mr. Hallmon asserts that these discrepancies in appearance as well as Mr. Hallmon's "more limited beard" in the photograph than on the date of the stop, "preclude a finding that [LeBaron] is credible." [Obj. at 13.] Again, this argument does not convince the Court that Officer LeBaron's testimony about comparing the photograph to the driver of the minivan lacked credibility. The photo is an image of Mr. Hallmon, which he acknowledges. [Def. Ex. 5.] And even if there were some details about Mr. Hallmon's appearance on the date of the stop that did not exactly match the photo in the DVS record, Officer LeBaron was not required to make a positive identification with absolute certainty to draw the reasonable inference that the registered owner was operating the vehicle. This was not a situation where the differences between the registered owner and the observed driver were so pronounced as to undermine the reasonableness of the stop. *See, e.g.*, *Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020)

("[I]f an officer knows that the registered owner of the vehicle is in his mid-sixties but observes that the driver is in her mid-twenties, then the totality of the circumstances would not raise a suspicion that the particular individual being stopped is engaged in wrongdoing.") (quotations omitted). It was sufficient that Officer LeBaron "possessed no exculpatory information—let alone sufficient information to rebut the reasonable inference that [Hallmon] was driving his own [minivan]—and thus the stop was justified." *Id.*

Mr. Hallmon also invites the Court to reject Officer LeBaron's testimony because he used deceptive techniques during the traffic stop, including when he suggested that the marijuana pouch was not a big deal, that Lebaron was not interested in writing tickets, and that he was not planning to arrest Hallmon. [Obj. at 8.] He argues that Officer LeBaron lacks all credibility because he admitted in his testimony that he "lies as a matter of practice." [Obj. at 13, 15.] Officer LeBaron admitted that he was not entirely forthcoming or truthful with Mr. Hallmon during the encounter. [Tr. 52–52, 66, 86.] But that reality does not undermine the credibility of Officer LeBaron's testimony regarding the basis for the stop. Officer LeBaron did not admit or even suggest that his common practice was to provide false testimony in court. Nor do any of Officer LeBaron's arguably deceptive statements to Mr. Hallmon minimizing the seriousness of the events that were unfolding suggest that he did not, in fact, observe a traffic violation. Moreover, Mr. Hallmon points to no authority supporting the idea that an officer who uses deception during an investigation cannot be believed in court. Indeed, officers often use deception during undercover operations. And the Eighth Circuit has affirmed a district court's

15

reliance on law enforcement testimony despite that officer's use of deception during an interrogation. *United States v. Aldridge*, 664 F.3d 705, 712–13 (8th Cir. 2012) (affirming district court's finding that a confession was voluntary when the court relied on the testimony of officers who lied during the interrogation to reach that conclusion). Finally, although the officer may have been downplaying his interest in finding evidence of a crime, statements like "I'm not a big ticket writer" and that an empty marijuana baggie is not a big deal may in fact be true, and Mr. Hallmon was neither ticketed for, nor charged with possession of the baggie, but was arrested for the firearm. And Ms. McGrone was sent on her way with no charges.

Finally, Mr. Hallmon argues that the initial stop and the decision to conduct a search of the vehicle were motivated by racial profiling. He encourages the Court to be "proactive in addressing abusive and racist police practices," and contends that the Court should avoid becoming complicit in such practices by "tak[ing] into account increasingly recognized realities about marijuana being used as a pretext to search African Americans." Mr. Hallmon cites investigations regarding the conduct of the Minneapolis Police Department ("MPD") that were undertaken in the wake of the murder of George Floyd as well as the terms of a recent consent decree. In particular, he points to findings regarding a "common practice of pulling over community member[s] of color and conducting searches for drugs and weapons without legal justification" often based upon officers claiming to have smelled marijuana in the vehicles. He argues that there is no reason to believe that Bloomington Police Department's policing practices are any different from MPD's. [Obj. at 20–22.]

16

The Court shares Mr. Hallmon's concerns about racial profiling. But under controlling precedent, the questions before the Court today concern whether Officer LeBaron observed a traffic violation prior to stopping the minivan, and whether the events of his subsequent encounter with Mr. Hallmon transpired as he testified. Higher courts have held that the subjective intent of an officer making a stop is irrelevant when determining whether that stop is valid. *E.g.*, *Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016) ("Once an officer has probable cause, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant.") (quotation omitted). The Court has reviewed all the evidence in the record and found Officer LeBaron's testimony on these issues to be credible, and Mr. Hallmon's arguments concerning racial profiling do not alter these conclusions. The record sheds no light on whether Officer LeBaron had any subjective intent in stopping the vehicle unrelated to the witnessed traffic violations. And given the state of the law, because there was probable cause to make the stop, Officer LeBaron's allegedly pretextual subjective motivation for pulling over the minivan does not establish a Fourth Amendment violation. Suppression of the evidence in this case is not the remedy for the problem of racial profiling that Mr. Hallmon identifies.

The Court has considered each aspect of Mr. Hallmon's objections concerning the credibility of Officer LeBaron's testimony, including those not explicitly addressed in this Order. Considered in their totality, Mr. Hallmon's arguments do not leave the Court with the impression that his testimony about his observations of traffic violations lacked credibility. The Court neither uncritically accepts the testimony of any witness, nor

categorically rejects it; nor is the Court blind to the possibility that an officer might make misrepresentations of facts regarding a stop to prevent the suppression of evidence. Although Mr. Hallmon insists that is what happened here and that "LeBaron made the stop and then made up the reasons afterwards," [Obj. at 16], the evidence simply shows otherwise.

Accordingly, the Court finds Officer LeBaron's testimony credible, overrules Mr. Hallmon's objections on this issue, and agrees with Judge Schultz that the initial stop of the minivan provides no basis for suppression of evidence.

### B.  Expansion of the Stop

Even when police have lawfully stopped a vehicle, the stop can become unconstitutional if it is unreasonably extended or prolonged. *United States v. Callison*, 2 F.4th 1128, 1131 (8th Cir. 2021). A traffic stop becomes unlawful "if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015) (cleaned up). This mission reasonably includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.*at 355. "[L]aw enforcement must be 'reasonably diligent' in carrying out that mission" to avoid unduly extending the stop. *United States v. Magallon*, 984 F.3d 1263, 1278 (8th Cir. 2021) (quoting *Rodriguez*, 575 U.S. at 357).

However, an officer may lawfully extend a traffic stop if the officer has a reasonable suspicion of additional criminal activity. *Rodriguez*, 575 U.S. at 355. "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic

stop as the circumstances unfold and more suspicious facts are uncovered." *Magallon*, 984 F.3d at 1278 (quotation omitted). "The suspicious facts must be specific and articulable facts which, taken together with rational inferences from those facts, amount to reasonable suspicion that further investigation is warranted." *Id.* (quotation omitted).

The R&R rejected Mr. Hallmon's arguments that the stop in this case was unlawfully prolonged because it exceeded the time necessary to address the traffic infraction, that Officer LeBaron's testimony was "specious" regarding his observations of signs of drug use, and that the bodycam footage failed to corroborate the signs of drug use LeBaron purportedly observed. [R&R at 8–9.] Judge Schultz found that Officer LeBaron's initial questions after approaching the vehicle were all related to the suspected traffic violations and were permissible. [R&R at 8 (citing *United States v. Olivera-Mendez*, 484 F.3d 505, 509 (8th Cir. 2007)).] Further, the R&R found that Mr. Hallmon and Ms. McGrone were speaking quickly and seemed nervous and that LeBaron observed signs of drug use "which were not visible on the bodycam footage." [R&R at 8.] Next, the R&R determined Officer LeBaron did not impermissibly expand the stop by running a criminal history check on Mr. Hallmon. [R&R at 8–9 (citing *Rodriguez*, 575 U.S. at 355).] Finally, the R&R concluded that it was reasonable for LeBaron to order Mr. Hallmon out of the vehicle during the traffic stop, in part because Mr. Hallmon's children were in the back seat and LeBaron wanted to discuss suspected drug use. [R&R at 9 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977)).]

Mr. Hallmon objects to these conclusions on several grounds, but as explained below, the Court finds that none of his objections requires suppression of evidence.

Mr. Hallmon reiterates that Officer LeBaron's testimony concerning suspected drug use "was both inadequate and incredible." He insists that the video evidence fails to corroborate Mr. Hallmon's purportedly dilated, bloodshot, and watery eyes, and similarly fails to support a finding that he was nervous, sweating, speaking quickly, or engaged in deceptive behavior. He argues that innocent factors (the recent passing of his daughter, and the heat and humidity) could just as easily explain the watery eyes and sweat. [Obj. at 17.] According to Mr. Hallmon, "LeBaron invented bogus excuses to suspect marijuana which must particularly be rejected in light of his previously discussed lack of credibility." [Obj. at 17.] Finally, Mr. Hallmon objects to the R&R's conclusion that it was reasonable for Officer LeBaron to order him to exit the vehicle to speak with him about suspected drug use and his suspended license. [Obj. at 19.]

The Court overrules these objections for several reasons. First, the video evidence and the testimony both confirm that during Officer LeBaron's initial conversations with the occupants of the minivan, nothing unreasonably expanded or prolonged the stop. Officer LeBaron asked questions about where they were going and why Mr. Hallmon was driving with a suspended license, discussed the suspended object from the rearview mirror, and asked follow-up questions about the information Mr. Hallmon and Ms. McGrone provided him. Shortly after that, Officer LeBaron went back to his squad car to run a criminal history check on Mr. Hallmon. These interactions and Officer LeBaron's background check were not unreasonably lengthy. The Eighth Circuit has held that such inquiries do not transform a lawful traffic stop into an unreasonably extended seizure. *Olivera-Mendez*, 484 F.3d at 509 (permitting "routine but somewhat time-

20

consuming tasks related to the traffic violation" including checking licenses, registration, criminal histories, and asking questions of the vehicle's occupants about their trip and following up on their statements); *United States v. Navarette*, 996 F.3d 870, 874 (8th Cir. 2021) (same).

Second, Officer LeBaron was permitted to ask Mr. Hallmon to step out of the car during the traffic stop. The Eighth Circuit has held that "[d]uring a lawful traffic stop, an officer may order the occupants to leave their car as a matter of course." *United States v. Gonzalez-Carmona*, 35 F.4th 636, 641 (8th Cir. 2022) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 109–11 (1977) (per curiam) and *United States v. Sanders*, 510 F.3d 788, 790 (8th Cir. 2007)). Even without the signs of nervousness and possible drug use described by Officer LeBaron, asking him to exit the vehicle for further discussion was allowed.

Moreover, the Court is not persuaded that Officer LeBaron's testimony concerning the observations which led him to suspect drug use lacked credibility. The bodycam footage corroborates Officer LeBaron's testimony that both Mr. Hallmon and Ms. McGrone were speaking quickly and appeared nervous early in the encounter. Ordinary nervousness alone is not enough to create a reasonable suspicion sufficient to

justify extending a traffic stop,[10] but this case involved something more than ordinary nervousness. LeBaron testified that he "saw the driver started to become increasingly more nervous to the point where standing sweat could be seen on his face and neck." [Tr. 8, 35.] It is true that the sweat and the details concerning Mr. Hallmon's allegedly watery, dilated, and bloodshot eyes are not visible on Officer LeBaron's bodycam video, but that footage does not contradict his testimony either. Officer LeBaron was standing on the passenger side of the vehicle when he made these observations, and the resolution and lighting of the video is such that one would not expect the video to show all the details that would likely be visible to the naked eye. And once Mr. Hallmon opened the door, Officer LeBaron saw the baggie with the marijuana leaf on it, providing additional indicia of criminal activity supporting a reasonable suspicion that justified further investigation.

Accordingly, Mr. Hallmon's objections on the issue of an unlawfully prolonged stop are overruled.[11]

_____

[10] *E.g.*, *United States v. Pacheco*, 996 F.3d 508, 512–13 (8th Cir. 2021) (comparing unusual nervousness of the defendant to the ordinary nervousness of the suspect found minimally suspicious in *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998)); *United States v. Bloomfield*, 40 F.3d 910, 918–19 (8th Cir. 1994) (distinguishing between the "customary" experience of people being "somewhat nervous" when stopped by police with "unusual" nervous behavior).

[11] In his Objections, Mr. Hallmon also suggests that Officer LeBaron unlawfully prolonged the stop by searching Mr. Hallmon after he took him out of the vehicle. Obj. at 19–20. However, as the Court explained above, *supra* note 6, the evidence shows Mr. Hallmon consented to a search of his person at this point in the encounter.

22

### C.  Vehicle Search

The automobile exception allows officers to conduct a warrantless search of a vehicle if they have probable cause to believe that it contains contraband or evidence of a crime. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005); *United States v. Evans*, 830 F.3d 761, 767 (8th Cir. 2016). The Eighth Circuit has held that officers are permitted to search vehicles if they have probable cause to believe that marijuana is present, either through its smell or otherwise. *United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020) (odor); *United States v. Rowland*, 341 F.3d 774, 785 (8th Cir. 2003) (paraphernalia); *see also United States v. Coleman*, 700 F.3d 329, 336 (8th Cir. 2012) ("Coleman told Trooper Bauer there was marijuana in his vehicle, providing probable cause to search the vehicle for drugs."). Here, by the time Officer LeBaron searched Mr. Hallmon's car, he had the required probable cause.

The R&R found that Officer LeBaron had probable cause to search the minivan because he had seen the marijuana baggie which was also plainly visible on his bodycam. [R&R at 10.] By opening and smelling the bag, the R&R found that Officer LeBaron confirmed that it had contained marijuana and he and Mr. Hallmon both agreed to that fact, though it was mostly empty. [R&R at 10.] Finally, the R&R concluded that probable cause existed based on Officer LeBaron's discussion with Mr. Hallmon and Mr. Hallmon's acknowledgment that there were likely small marijuana blunts left in the ashtray. [R&R at 10.]

Mr. Hallmon objects that "LeBaron lacked any credible basis to conduct a search of the vehicle." He contends that the "R&R erroneously relies on an empty bag as

23

sufficient grounds to search the vehicle" and "wrongly states that Mr. Hallmon admitted that it smelled like marijuana or that there were blunts in the car." [Obj. at 20.]

Here, the Court overrules Mr. Hallmon's objections and concludes that the automobile exception justifies Officer LeBaron's search of the vehicle and the containers within it based upon all of the facts he learned prior to commencing his search and on current controlling Eighth Circuit jurisprudence. The baggie contained a depiction of a marijuana leaf and included the words "cannabis flower" on the outside of the packaging, and LeBaron testified that he immediately recognized it from his experience as an officer to be a baggie commonly used for carrying marijuana. Officer LeBaron testified that he could smell the odor of marijuana in the bag, and both the bodycam and the squad video confirm that he opened the bag and smelled inside of it. Mr. Hallmon can also be seen smelling the inside of the bag on these videos, and though the audio is not entirely clear, it appears to align with Officer LeBaron's testimony that he agreed that the baggie smelled of marijuana. It is true that Mr. Hallmon initially denied there were any drugs in the vehicle. [Gov't Ex. 1 at 6:45 (saying "no sir" in response to the question "is there any weed in the car?").] Later, Officer LeBaron asked him again if there was weed in the car. [Gov't Ex. 1 at 8:53–54 (Q: "Is there any weed in the car, even just paraphernalia, you know what I mean?").] This time, Mr. Hallmon acknowledged that there was probably some blunts or roaches in the ashtray from what he had smoked by himself the day before, though the audio is admittedly more difficult to hear at this point. [Gov't Ex. 1 at 8:56–9:08.] Given all these facts, including Mr. Hallmon's admission, Officer LeBaron had probable cause to believe that the minivan contained contraband or evidence of

24

criminal activity—namely, the use of marijuana—and his search of the vehicle, including

containers within it such as the purse, was justified under the automobile exception.

*United States v. Farrington*, 42 F.4th 895, 899 (8th Cir. 2022) (explaining that a search of

a vehicle for contraband under the automobile exception may include "containers

discovered within the automobile") (citing *California v. Acevedo*, 500 U.S. 565, 579-80

(1991)); *Coleman*, 700 F.3d at 336 (finding defendant's admission that there was

marijuana in the vehicle provided probable cause for the search).

For these reasons, the Court concludes that the search of the vehicle did not violate

Mr. Hallmon's Fourth Amendment rights. Because the initial stop was valid, the stop was

not unreasonably prolonged, and the warrantless search of the vehicle was justified under

the automobile exception, Mr. Hallmon's motion to suppress evidence is denied.

### D. Motion to Suppress Statements

Mr. Hallmon also moves to suppress the statements he made to Officer LeBaron

during the traffic stop. In *Miranda v. Arizona*, the Supreme Court held that "the

prosecution may not use statements, whether exculpatory or inculpatory, stemming from

custodial interrogation of the defendant unless it demonstrates the use of procedural

safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444

(1966). "The basic rule of *Miranda* is that an individual must be advised of the right to be

free from compulsory self-incrimination, and the right to the assistance of an attorney,

any time a person is taken into custody for questioning." *United States v. Griffin*, 922

F.2d 1343, 1347 (8th Cir. 1990).

Like many cases involving law enforcement questioning where no *Miranda* warnings are provided, this comes down to whether the suspect was "in custody" at the time he was questioned.[12] "Whether a suspect is in custody is an objective inquiry, where we assess both the circumstances surrounding the interrogation and whether a reasonable person would have felt at liberty to end the interrogation and leave." *United States v. Soderman*, 983 F.3d 369, 376 (8th Cir. 2020) (quotations omitted). The custody issue is determined based on "the totality of the circumstances confronting the defendant." *United States v. Roberts*, 975 F.3d 709, 716 (8th Cir. 2020).

Generally, courts consider six well-known factors set forth in *Griffin* when evaluating the issue of custody. 922 F.2d at 1349.[13] But these factors are not exclusive and the inquiry "cannot be resolved merely by counting up the number of factors on each side of the balance." *Roberts*, 975 F.3d at 716 (quoting *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004)). And in general, if questioning happens during a traffic

---

[12] Given that he was presented with direct questioning, there is no dispute that Mr. Hallmon was "interrogated" within the meaning of the *Miranda* rule. *Griffin*, 922 F.3d at 1347 (indicating that under *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) interrogation is direct questioning or practices likely to elicit an incriminating response from a suspect).

[13] A panel of the Eighth Circuit Court of Appeals has recently questioned whether an arrest at the end of questioning, one of the six *Griffin* factors, is indicative of custody because "custodial status depends on whether a reasonable person would feel free to leave during the interview." *United States v. Treanton*, 57 F.4th 638, 641 (8th Cir. 2023). The *Treanton* court stated that "[d]icta in a footnote in *Griffin* said that in an appropriate case, a post-interview arrest may suggest an end run around *Miranda*, but this notion was not further explained and has never been adopted in a holding of the court." *Id.* at 641–42 (cleaned up). The concurrence explained that despite questions about its continued relevance, "this factor still counts." *Id.* at 643 (Stras, J., concurring).

26

stop, the various factors give way to a broad rule. Although a traffic stop "significantly curtails the freedom of action of the driver and the passengers" making it a seizure for purpose of the Fourth Amendment, a person detained during a traffic stop is rarely in custody for *Miranda* purposes because such detention does not "sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Berkemer v. McCarty*, 468 U.S. 420, 436, 437 (1984) (quotations omitted). Generally speaking, "[a] stop is not custodial if it does not constrain the defendant to the degree associated with an arrest." *Soderman*, 983 F.3d at 376 (quotations omitted). While comparing custody for *Miranda* purposes to a formal arrest, the Eighth Circuit has recently clarified that "[e]ven if a reasonable person in [the motorist's] position would not have felt free to leave, this does not amount to custody." *United States v. Johnson*, 954 F.3d 1106, 1111 (8th Cir. 2020); *United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003) ("[W]e reject [the] broad contention that a person is in custody for *Miranda* purposes whenever a reasonable person would not feel free to leave. One is not free to leave a *Terry* stop until the completion of a reasonably brief investigation, which may include limited questioning. But most *Terry* stops do not trigger the detainee's *Miranda* rights.").

Applying the *Griffin* factors, Judge Schultz found that Mr. Hallmon was not in custody and recommended denying his motion to suppress statements. [R&R at 11–17.] Mr. Hallmon objects to the R&R and argues that he was in custody at the time of Officer LeBaron's questioning and addresses each of the *Griffin* factors as well. However, Mr. Hallmon's factor-by-factor discussion disregards the overriding rule that traffic stops

almost never constitute custody for the purposes of *Miranda*.[14] The focus of the analysis must be on whether Mr. Hallmon "was restrained as though he were under formal arrest." *United States v. Laurita*, 821 F.3d 1020, 1024 (8th Cir. 2016) (quotation omitted). In this case, nothing about the traffic stop makes it tantamount to an actual arrest.

Until Officer LeBaron formally arrested Mr. Hallmon, he was never placed in handcuffs and generally had unrestrained freedom of movement throughout the encounter. Mr. Hallmon was never struck, nor was he subjected to any strong-arm tactics of any kind, and weapons were not drawn. There were never more than two officers on the scene throughout the encounter, so the atmosphere of the questioning was hardly police dominated. And the overall duration of the questioning was relatively brief, it took place in a public parking lot, and Mr. Hallmon was neither told that he was going to be detained nor questioned for a lengthy period.[15] Such facts place this case far closer to the

---

[14] The Supreme Court has not held that *Miranda* warnings are *never* required during a traffic stop, and this Court does not suggest otherwise. *See Berkemer*, 468 U.S. at 440 ("If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*.").

[15] With respect to Mr. Hallmon's contention that Officer LeBaron used deception to elicit a confession from him, the Eighth Circuit has stated that "[t]he use of deception is irrelevant unless it relates to a reasonable person's perception of his freedom to depart." *Laurita*, 821 F.3d at 1026 (citing *United States v. Ollie*, 442 F.3d 1135, 1139 (8th Cir. 2006)). Here, Mr. Hallmon does not explain how Officer LeBaron's purportedly deceptive statements about writing tickets or arresting anyone would have prevented a reasonable person from having felt that he could not terminate the questioning. *Ollie*, 442 F.3d at 1139 (explaining that officer's false implication that suspect's fingerprints were on a firearm, which was admittedly designed to elicit a confession, did not affect the custody determination because it "would not have acted to prevent a reasonable person from terminating the interview").

circumstances of traffic stops which the Eighth Circuit has found to be non-custodial—
even when they also ended in arrests for serious felonies—than to those which were
found to be custodial. *See Soderman*, 983 F.3d at 377 (defendant not in custody despite
being in back of patrol car); *Johnson*, 954 F.3d at 1111 (similar); *Coleman*, 700 F.3d at
336 (similar); *United States v. Rodriguez*, 711 F.3d 928, 935 (8th Cir. 2013) (defendant
not in custody where he was asked to step out of the car and was placed in handcuffs after
telling the officer he had a handgun in the car, but was told he was not under arrest); *see
also Berkemer*, 468 U.S. at 441–42.

    In the end, this case highlights the practical effect of the legal rules governing this
area and illustrates a disconnect between what ordinary people likely believe it means to
be in custody and what it means to be in "custody" for purposes of *Miranda* during a
traffic stop. Anyone watching the bodycam footage of this traffic stop can plainly tell that
there is a point in the encounter at which no reasonable person in Mr. Hallmon's position
could think that the encounter with the police was going to end with just a traffic ticket or
a warning. Indeed, once the gun is found, everyone knows that someone is going to get
arrested. After Officer LeBaron's search concludes and he talks to Ms. McGrone and
then to Mr. Hallmon, they both know right away that he has located the firearm. They
also both know that consequences are on the immediate horizon. Ms. McGrone promptly
laments that Mr. Hallmon is "all that I have," knowing that someone is going away. And
Mr. Hallmon repeatedly says that he is "taking the fall" for the firearm. Officer LeBaron
knows someone is getting arrested too, and there is only one purpose for his continued
questioning of Mr. Hallmon—to determine whose gun it is. At this point, Mr. Hallmon is

arguably even more clearly in custody and even less free to leave than before the gun's discovery. But the law tells us that this is still not enough for a person to be "in custody" for purposes of *Miranda* because "[e]ven if a reasonable person in [Mr. Hallmon's] position would not have felt free to leave, this does not amount to custody." *Johnson*, 954 F.3d at 1111. In this way, law enforcement questioning during a traffic stop becomes a useful evidence-gathering tool for prosecuting the unsuspecting motorist, and citizens investigated on the side of the road have to be aware on their own of their right to silence.

For all these reasons, the Court concludes that Mr. Hallmon was not in custody at the time of his questioning and denies Mr. Hallmon's motion to suppress statements.[16]

### IV.   Order

Based on the discussion above, **IT IS HEREBY ORDERED THAT**

Mr. Hallmon's Objections [ECF 84] are overruled; the Report and Recommendation [ECF 76] is accepted; the Motion to Suppress Stop and Search [ECF 24] is denied; and the Motion to Suppress Statements [ECF 25] is denied.

Date: September 27, 2023

     *s/Katherine Menendez*
Katherine Menendez
United States District Judge

---

[16] The Court has considered only those statements made prior to when Mr. Hallmon was placed under arrest. Any statements Mr. Hallmon made following his arrest are not at issue here.